IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| v. | : | CRIMINAL CASE NUMBER: |
| JUAN DEANTE ROBINSON, | : | 1:14-CR-151-WSD-JSA |
| Defendant. | : | |

## **REPORT AND RECOMMENDATION**

Defendant was arrested by DeKalb County police during a traffic stop on August 13, 2013.  The evidence seized during that stop eventually led to this federal indictment, which charges Defendant with various drug trafficking and firearms violations.  The case is now before the Court on Defendant's Motions to Suppress Evidence and Statements [12] [13] [22], after an evidentiary hearing and the submission of post-hearing briefs.  Defendant argues that the Government cannot sustain its burden to show the proprietary of the warrantless seizure and subsequent search of his vehicle and that the evidence obtained as a result (including his statements) must be suppressed.  The Government argues probable cause supported the traffic stop and that various doctrines supported the ensuing warrantless search.  The Government also argues that Defendant has not demonstrated standing to challenge the search of the vehicle.  For the reasons explained below, the undersigned **RECOMMENDS** that the Motions to Suppress

be **DENIED**.

### Factual Background

On August 13, 2013, Officer Dejarnette of the DeKalb County Police Department was patrolling the area of Joy Lane (near Peachcrest Road) in southern DeKalb County.  *See* Transcript of March 23, 2015 Evidentiary Hearing [25] ("Tr.") at 5-6.  Lt. Baker instructed Officer Dejarnette to look out for and get the tag number of a white Pontiac Grand Prix that was driving in the area – on Sherrydale Lane towards the intersection of Longleaf Drive and Peachcrest Road – and to see if he recognized anyone in the car.  *Id*. at 8-9.  Officer Dejarnette stopped his car at the intersection of Peachcrest Road and Pinehill Drive, and observed the white Pontiac a few moments later, approaching the intersection of Peachcrest Road and Longleaf Road approximately 1/10 of a mile away.  *Id.*  at 8-9, 13.  Officer Dejarnette could not see the driver (which turned out to be the Defendant) but testified that he recognized one of the backseat passengers.  *Id.*

According to Dejarnette's testimony at the hearing, he saw the Pontiac begin to slow down as it reached the stop sign at Peachcrest Road.  *Id.*  However, when the driver appeared to look in the direction of Dejarnette's marked vehicle, the Pontiac accelerated into the intersection without stopping at the stop sign.  *Id.*  In doing so, the Pontiac also cut off a pickup truck that had control of the lane on Peachcrest Road, nearly running it off the road.  *Id.* at 13-14.  These violations

caused Dejarnette to pull over the Pontiac on a nearby side road.  *Id.* at 19.

Officer Dejarnette's incident report from that day stated, in the narrative section, that "I observed a white Pontiac Grand Prix turn in front of another vehicle from Longleaf Dr. to Peachcrest Rd."  (Def. Ex. 1).  The narrative description did not mention a failure to stop at the stop sign, but the report specifically listed "failure to obey traffic-control device" as one of the relevant incidents.  *Id.* at p. 3. Although there was no traffic light at that intersection, the incident was listed as a "non-codeable" failure-to-obey traffic device, which according to Officer Dejarnette is how stop sign violations are reflected in the police department's computer system.  *Id.*; Tr. at 61. Defendant was not charged with cutting off the pickup truck.  Ultimately, based on evidence obtained during the traffic stop, Defendant was cited for narcotics offenses, firearm possession, failure-to-obey the traffic control device, driving on a suspended license and failure to restrain child under five.  (Def. Ex. 1 at pp. 2-3).

When Officer Dejarnette first met with federal agents and prosecutors, on two occasions, he could not specifically recall whether the Pontiac had properly stopped at the sign.  Tr. at 16-17.  While Officer Dejarnette generally recalled that the Pontiac had pulled out in front of another vehicle, in his initial meeting with federal prosecutors he stated "I thought it was a Marta bus or some kind of truck." *Id.* at 18.

At some point thereafter, Officer Dejarnette discussed the matter with an Officer Anderson, who was with Officer Dejarnette during the August 13, 2013 incident involving Defendant. *Id.* As Officer Dejarnette explained, "[Officer Anderson] had reminded me about where we were, kind of how everything played out, and that brought to light more of my memory of what happened that day." *Id.* at 17-18. After this meeting, Officer Dejarnette met with the federal prosecutors again, at which point he recalled, as he later testified, that the Pontiac failed to stop at the sign and then pulled in front of a gray Ford Ranger. *Id.*

After pulling over the Pontiac, Officer Dejarnette approached the driver's side door. *Id.* at 19. He smelled an "odor of marijuana coming from the vehicle." *Id.* at 27.[1] He recognized the driver as the Defendant, Juan Robinson, with whom Officer Dejarnette had interacted in the past. *Id.* at 19. He also represented another adult passenger as well as a 13 year-old child who was wearing a back brace, who Officer Dejarnette knew had recently been shot. *Id.* The Officer also observed a young child (later identified as being five years old) who was sitting in the back seat without a car seat. *Id.* at 21.

Officer Dejarnette asked Defendant to produce his driver's license, but all Defendant produced was a non-driver's state identification card. *Id.* at 19-20.

---

[1] Dejarnette could not recall the marijuana smell when he intially met with the prosecutors, although this smell is referenced in the incident report. Tr. at 27; Def. Ex. 1 at 2.

Officer Dejarnette determined through computer searches that Defendant did not have a valid driver's license, and at that point Officers Dejarnette and Anderson asked Defendant to step out of the vehicle and they conducted a pat-down of his clothing.  *Id.* at 23-24.  During his pat-down Officer Dejarnette felt what he recognized by the feel to be a firearm magazine.  *Id.*  He retrieved the magazine (which was loaded) and placed Defendant in handcuffs.  *Id.*  As there were young children still in the car, Officer Dejarnette asked Defendant whether the gun to which the magazine belonged was still in the car, and Defendant stated "he wasn't sure if his wife took it out or not."  *Id.* at 24-25.  Officer Dejarnette placed Defendant in custody in the police car at this time.  *Id.*

Thereafter, the officers asked all of the passengers to leave the car.  *Id.* at 27-28.  During this process, Officer Anderson stated that she noticed one of the passengers had been sitting on "a small cigar wrapper which appeared to have – be wrapped up with a green leafy substance and it was right underneath him," which the officers recovered  *Id.*  The officers then conducted a full search of the passenger compartment of the vehicle, including the locked glove box.  In the glove box they found a loaded .40 caliber hand gun that Officer Dejarnette determined matched Defendant's magazine, approximately 30 individually-wrapped baggies of apparent marijuana, a glass jar of apparent marijuana, a digital scale, a small baggie with a white rocky substance that later tested positive for

crystal methamphetamine, and several empty baggies. *Id.* at 31. According to Dejarnette, this search was considered an inventory search in preparation for an impoundment of the car required by DeKalb County Police Department policy. *Id.* at 29-30. Specifically, the policy requires impoundment (and an inventory search) of a car where the driver is arrested and no licensed drivers are present. *Id.*; Gov't Ex. 7. Officer Dejarnette testified that there was no one else able to legally drive the car from the scene, the registered owner was not present, and the car could not be simply left in the public roadway. Tr. at 29-30.

At some point during this process, Officer Dejarnette heard Defendant making noise in the police car. *Id.* at 32-33. Officer Dejarnette went to check on the Defendant, asking "what's wrong, is everything ok," and Defendant responded, "everything is mine, its all mine." *Id.* at 33, 54. Later, after Officer Dejarnette recovered the firearm, he returned to the car and told Defendant "it's not good to have the kids in there with all the stuff, especially after the incident that just happened to the 13 year-old child," to which Defendant responded, "I have to do something, my wife's sick . . . and I have to do something to make money." *Id.* at 35-36, 55.

**Discussion**

### A.   *Defendant's Standing To Challenge The Stop*

To have standing to challenge a search, one must manifest a subjective expectation of privacy in the invaded area that "society is prepared to recognize as reasonable." *Rakas v. Illinois*, 439 U.S. 128, 143 n.12 (1978) (quotation omitted); *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998).  The individual's expectation, viewed objectively, must be justifiable under the circumstances. *Smith v. Maryland*, 442 U.S. 735, 740-41 (1979).

Generally, a mere passenger in a car lacks standing to challenge a search. *See Rakas*, 439 U.S. at 140.  However, the courts have generally upheld the standing of drivers to challenge searches of those cars, so long as the driver at least has the permission of the lawful owner to possess the car.  *See United States v. Gibson*, 708 F.3d 1256, 1277 (11th Cir. 2013); *United States v. Miller*, 821 F.2d 546, 548 (11th Cir. 1987). A defendant, however, bears the burden of showing a legitimate expectation of privacy in the area searched.  *United States v. Ramos,* 12 F.3d 1019, 1023 (11th Cir. 1994).

Here, it is undisputed that Defendant was not an owner of the car.  Rather, there is evidence in the record that the car belonged to the Defendant's wife.  [25] at 47-48.[2]  Neither the Defendant nor his wife specifically testified to establish

---

[2] Neither the Defendant nor his wife testified to this fact, but defense counsel elicited the following statement from Officer Dejarnette on cross examination: "Q.  And you found out during the stop or maybe even before that the car belonged

Defendant's permission to drive the car.  Defendant argues that the Court should infer permission because the car "was properly insured, registered, it did not appear to be stolen, and Mr. Robinson had the key." [27] at 4 (citing Tr. at 45).  Indeed, Officer Dejarnette testified that he saw the Defendant driving the same car on other occasions.  Tr. at 43.

Because there is evidence in the record showing that Defendant had a direct family relationship with and in fact lived with the car owner, because the Defendant has driven this car on multiple occasions, and because there is no indication that the car was reported as stolen, the Court finds that enough evidence exists to support the Defendant's standing, albeit barely. The Court will now proceed to consider the stop and search of the car on the merits.

**B.**   *The Traffic Stop Was Legal*

---

to Mr. Robinson's wife?  A.  During the stop, yes."  (Tr. at 47-48).  The Government suggests that this testimony about the car's ownership was based solely on the "self-serving" statements by the Defendant to the officer.  But the source of the Officer's knowledge on this point is not clear to the Court, and the fact remains that he adopted Defense counsel's assertion as to the relationship between the Defendant and the car owner, without any disclaimer as to a lack of or unreliable basis of knowledge.  Officer Dejarnette also testified that he previously knew the Defendant from "multiple" times that he responded to "the house that him and his wife lived at," Tr. at 36, which suggests that the Officer's knowledge of Defendant's marital situation was based on more than just what Defendant told him at the time of arrest.  In any event, the Government offers no contrary evidence suggesting that the car was not owned by the Defendant's wife.  The Court therefore finds for purposes of this motion that car was in fact owned by Defendant's wife.

To at least briefly stop a vehicle, an officer must have reasonable and articulable suspicion that the occupants are engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 27 (1968); *United States v. Sharpe*, 470 U. S. 675, 682-83 (1985). To make a showing that in fact the officers had reasonable suspicion, they "must be able to articulate more than an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity.'" *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000) (quoting *Terry*, 392 U.S. at 27). However, the "officer's motive in making the traffic stop does not invalidate what is otherwise 'objectively justifiable behavior under the Fourth Amendment[.]'" *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999) (quoting *Whren v. United States*, 517 U.S. 806, 812 (1996)).

Probable cause is not required to justify an investigative stop; reasonable suspicion is sufficient. *United States v. Powell*, 222 F.3d 913, 917-18 (11th Cir. 2000); *United States v. Mikell*, 102 F.3d 470, 474-75 (11th Cir. 1996). However, if the scope of a traffic stop exceeds that of an investigative stop of limited duration, it constitutes an unreasonable seizure unless it is supported by probable cause. *See United States v. House*, 684 F.3d 1173, 1199 (11th Cir. 2012).

Here, Officer Dejarnette testified that he stopped Defendant's car because Defendant failed to stop at the stop sign and also veered in front of an oncoming truck. Defendant does not contend that these circumstances would fail to constitute reasonable suspicion. Defendant's principal argument is that the Court

should not credit Officer Dejarnette's testimony as to the circumstances that led to the stop.  Defendant points out that Officer Dejarnette in previous interviews could not recall that the Defendant's car failed to stop at the stop sign, and mis-remembered other details of the incident.[3]  Officer Dejarnette also did not specifically describe a failure to stop in his narrative description of the incident in the police report, although he included a "failure to obey traffic control device" in the report as one of the violations being cited.  Def. Ex. 1.  While Officer Dejarnette now claims to remember these details, that is only because he consulted before the hearing with the other officer who was present at the incident but who did not testify.

It is true that Officer Dejarnette did not display perfect recall of the incident. It was also not advisable for Officer Dejarnette to consult with another fact witness about the events prior to testifying.  The Court has considered these factors as weighing against the reliability of the testimony.  Otherwise, that Officer Dejarnette needed to be refreshed with his own police report to recall specific details of this isolated event that occurred over a year earlier, or displayed some imperfect recall in early meetings with the prosecutors, while relevant, is not itself grounds to reject his testimony.

---

[3] For example, in prior interviews the Officer stated that he could not recall whether the Defendant's car pulled out in front of a truck or MARTA bus, whereas at trial he testified more defnitively that it was a white pickup truck.  (Tr. at 18).

The Court finds that Officer Dejarnette's contemporaneous police report generally corroborates his testimony at least in most relevant points.  The report specifically states, just as Offier Dejarnette testified, that he observed the Defendant's car turn in front of another vehicle.  Def. Ex. 1 at 1.  The Court does not find that the Officer's hestitation about whether the other vehicle was a "truck," a MARTA bus, or a "pickup truck," to significantly degrade from his credibility, especially where the fact of this incident was recorded in the contemporaneous report.

The facts with regard to the failure to stop are more muddled.  Weighing in favor of the Officer's credibility, his contemporaneous report specifically documents that he observed the Defendant fail to obey a "traffic control device" as one of the various other incidents he observed.  *See* Def. Ex. 1 at page 3.  However, Defendant points out that the Officer omitted any mention of the failure to stop in his narrative description of the events of that day.  This detracts from the report's corroborative value, since one would expect that significantly important facts would be described in the narrative.[4]  Nevertheless, it is of some probative value

---

[4] Defendant also argues that the report contradicts the testimony because the report alleges a failure to control a "traffic control device," whereas the intersection at issue contained only a stop sign, not a lighted device.  However, Defendant points to no evidence to show that a reference to a "traffic control device" necessarily refers only to a traffic light, as opposed to stop sign.  And Officer Dejarnette specifically testified – without contradiction – that the reference to a failure to obey a device, combined with the use of the incident code "nonc,"

that the failure to stop is documented in the contemporaneous written report, however briefly.

Defendant also argues that Officer Dejarnette's testimony is incredible to the extent that he purported to recognize one of the passengers in the car as an individual named Devon Fairly. *See* Tr. at 13, 37. Defendant argues that this recognition is not credible in light of the distance between the Officer's car and the Defendant's car. *See* Tr. at 12-15, Gov't Exs. 2 and 3.[5] Based solely on the photograph in Gov't Ex. 3, it does seem difficult to conclude that someone with ordinary vision stationed at one of the intersections could have recognized a passenger's face sitting in a car at the other intersection. But there was no testimony as to whether any magnification, reduction, or zooming in or out was applied in taking this photograph. More importantly, the Court cannot discern any motive for Officer Dejarnette to testify falsely about recognizing Devon Fairly. Officer Dejarnette offered no testimony to explain what if any significance attached to seeing Fairly in the car, and this observation is not identified at as any

---

for "non-codeable," is how traffic sign violations are reflected in the police department's computer system. *See* Tr. at 60-61. The Court does not perceive a reason to question the Officer's credibility based on the wording of this entry.

[5] Specifically, referring to Gov't Ex. 3, the Officer testified that he was located at the lighted intersection of Pine Hill and Peachcrest Roads that is visible in the distance and Defendant's car was located at the intersection of Longleaf Drive and Peachcrest, which is in the foreground of the photograph.

ground contributing to reasonable suspicion.

Defendant points to no evidence in the record affirmatively controverting Dejarnette's testimony. In other words, there is nothing to suggest that Defendant's car did stop or did not veer in front of another vehicle. To be sure, the Government bears the burden of proof, and cannot prevail based only on incredible testimony that cannot be accepted. But while Dejarnette's testimony was not perfect, in balancing all of the facts, including the lack of any controverting testimony, the Court finds that the testimony is sufficiently credible and reliable. Thus, the Court finds that Officer Dejarnette witnessed and stopped the car on the basis of these traffic violations. Defendant does not argue that these violations failed to qualify as reasonable suspicion and the Court finds that they do. The Officer's stop of the vehicle was, therefore, lawful.

Defendant does not separately argue that Officer Dejarnette lacked a legal basis to search the car. Rather, Defendant's only argument as to the illegality of the search was that the initial stop was unjustified. Having rejected that argument for the reasons described above, the Court finds that Defendant's Motion should be denied to the extent it seeks suppression of the fruits of the vehicle stop, including the search of the car.

**C.     *Whether Defendant's Statements Were Obtained In Violation of Miranda***

Defendant's principal argument with regard to his statements to Officer Dejarnette is that those statements were fruits of the illegal initial seizure of the car. As explained above, the Court rejects that argument. Defendant secondarily argues that certain statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).

In *Miranda*, the Supreme Court held that a suspect who is in custody must be advised of his right to remain silent and of his right to the assistance of counsel prior to any interrogation by law enforcement. It is not disputed that Defendant made various statements to Officer Dejarnette before the furnishment of any *Miranda* rights. First, after determining that Defendant was driving without a license and was carrying a loaded magazine, Officer Dejarnette asked Defendant whether the gun was still inside the car, to which the Defendant said, "he wasn't sure if his wife took it out or not." Tr. at 24-25. Second, after Officer Dejarnette heard Defendant making noise in the police car, Officer Dejarnette went to check on the Defendant, asking "what's wrong, is everything ok," and Defendant responded, "everything is mine, its all mine." *Id.* at 33, 54. Third, after Officer Dejarnette recovered the firearm and suspected drugs, he returned to the car and told Defendant "it's not good to have the kids in there with all the stuff, especially after the incident that just happened to the 13 year-old child," to which Defendant responded, "I have to do something, my wife's sick . . . and I have to do something

to make money." *Id.* at 35-36, 55.

The Government agrees that Defendant was in custody during these statements. Rather, the issue is whether these statements were obtained as the result of *interrogation* by Officer Dejarnette. It is well established that *Miranda* only applies where "a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980); *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991) ("Voluntary and spontaneous comments by an accused . . . are admissible evidence if the comments were not made in response to government questioning."). Officers engage in the "functional equivalent" of express questioning when they use "any words or actions . . . (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 309 n.5. In determining "whether the police practice was so *coercive* that it was likely to evoke an incriminating response," we must "focus[ ] primarily upon the perceptions of the suspect, rather than the intent of the police." *United States v. Stubbs*, 944 F.2d 828, 832 (11th Cir. 1991) (emphasis in original).

Under the public safety exception, an officer also does not engage in impermissible interrogation by asking about the presence of guns or weapons at the scene of a traffic stop or other arrest. *See United States v. Smith*, 322 F. App'x

876, 878 (11th Cir. 2009); *United States v. Newsome*, 475 F.3d 1221, 1225 (11th

Cir. 2007) (officer permissibly asked arrested defendant, before Miranda warnings,

"[i]s there anything or anyone in the room I should know about," to which

defendant disclosed the location of a gun); *United States v. Jackson*, 280 F.3d 403,

405-06 (4th Cir. 2002) (finding that an officer was "fully justified" in inquiring

about weapons after making a traffic stop).

Defendant's request to suppress two of his three statements are easily

rejected under these standards.  First, as noted above, Officer Dejarnette was

permitted, for his own safety and that of the others at the scene including the minor

child who was still in the car, to ask Defendant about whether there was a gun in

the car.  Second, Officer Dejarnette did not remotely engage in interrogation by

simply following up on Defendant's indications of distress by asking, "is

everything ok?"  This interchange was initiated by Defendant, to which Dejarnette

simply followed up.  And his followup question was apparently focused on

whether Defendant was in distress, and was not objectively likely to provoke an

incriminating statement.  *See generally United States v. Briggs*, 273 F.3d 737, 739

(7th Cir. 2001) (officer did not engage in interrogation by responding to an arrestee

who had invoked his right to counsel but also said, "[i]t doesn't matter anyway.

I'm going to die," by simply asking the defendant what he meant by that statement,

which question was related to the mental and physical well-being of the suspect

and was not reasonably likely to elicit an incriminating response).

Dejarnette's last interchange with Defendant warrants somewhat more discussion.  Dejarnette affirmatively confronted Defendant by telling him "its not good to have" drugs and guns in a car with a young child.  This statement was not worded as a question, but Defendant argues that it was reasonably likely to provoke a response or explanation for why Defendant would have guns and drugs in a car with a child, which would likely be incriminating.

The Government argues that the Supreme Court's seminal decision in *Innis*, 446 U.S. at 303 is factually analogous, and that this precedent requires denial of Defendant's motion to suppress.  The Court agrees on both points.  In *Innis*, several officers drove a murder suspect, who had already invoked his *Miranda* rights, to the police station in the back of their car. Although barred from directly questioning the suspect, one officer mentioned ostensibly to the others, in earshot of the suspect, that "there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves," to which statement one of the other officers responded, "it would be too bad if the little – I believe he said a girl – would pick up the gun, maybe kill herself."  *Id.* at 294-95.  At that point, the suspect interrupted the conversation, and offered to take the officers back to show them where to find the gun he had used. *Id.* at 295. The Supreme Court concluded that the officers did not violate *Miranda*,

because they did not interrogate him directly after he invoked his rights, and the conversation set out above was not reasonably likely to elicit an incriminating response. *Id.* at 302-03. As the Court explained, while the officers' guilt trip may have applied some "subtle compulsion," the facts were insufficient to find outright interrogation:

> That the officers' comments struck a responsive chord is readily apparent. Thus, it may be said, as the Rhode Island Supreme Court did say, that the respondent was subjected to "subtle compulsion." But that is not the end of the inquiry. It must also be established that a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response. This was not established in the present case.

*Id.* at 303.

The similarities of this case to *Innis* are striking, although of course there are some distinctions. In this case, Officer Dejarnette spoke directly to Defendant, unlike in *Innis*, in which the conversation technically was among police officers. Also, in this case, the Officer's comment related to a particular child that apparently had some relationship with the Defendant, unlike in *Innis*, in which the statements at issue were about hypothetical children.

Nevertheless, looking at the totality of the facts from a suspect's vantage point, Officer Dejarnette's conversation with Defendant was far less likely to elicit an incriminating response than what happened in *Innis*. Most importantly, the strength of any guilt trip applied by Officer Dejarnette was far weaker than that

applied by the officers in *Innis*.  In *Innis*, the officers identified an immediate and very serious public safety danger that a response from the suspect was required to address.  In this case, by contrast, the circumstances do not suggest any immediate threat to the safety of the child, or any utility of a response from Defendant in addressing such a threat.  As of when Dejarnette made the statement to Defendant, it appears that the child was out of the car, the gun and drugs had been recovered, and the Defendant (who was still at the scene in the back of Dejarnette's car) would have known that.  Dejarnette's statement was more of an admonishment about future safety practices than something evoking an immediate concern about the danger of a child.  Put another way, unlike *Innis*, the safety of the child did not hinge on any response from Defendant.  Defendant could have easily said nothing, could have simply nodded or said "yeah" to simply acknowledge the admonishment, or could have denied knowledge that he knew the gun and drugs were inside the car, and none of these responses would have increased any threat to the child.  That the Defendant responded with incriminating admissions did not particularly assist the child and was not otherwise reasonably likely.[6]

---

[6] The Court in *Innis* contemplated that any knowledge the police may have concerning an usual susceptibility of a suspect to particular forms of persuasion might be an important factor in determining whether they should have known that their words or actions were likely to elicit an incriminating response.  *See Innis*, 446 U.S. at 302 n.8.  Here, few facts were introduced at the hearing about the children and their relationship with the Defendant. More generally, however, even assuming that Defendant was bound by family ties and affection to protect the

Thus, Defendant's Motion to Suppress should be **DENIED** as it relates both to the evidence seized at the scene as well as all statements Defendant made.

This case is **READY FOR TRIAL**.

**IT IS SO RECOMMENDED** this 7th day of July, 2015.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE

---

children, that in itself would not have made him particularly susceptible to incriminate himself in response to Dejarnette's admonishment.  Again, the children appeared to be out of danger and away from the gun and drugs, which the police had secured, at the time of the conversation.