# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.                                          1:14-cr-151-WSD

JUAN DEANTE ROBINSON,

Defendant.

## OPINION AND ORDER

This matter is before the Court on Defendant Juan Deante Robinson's ("Defendant") Objections [39] to Magistrate Judge Justin S. Anand's Report and Recommendation ("R&R") [35], which recommends that Defendant's Motion to Suppress Statements (the "Statements Motion") [12], Motion to Suppress Evidence [13] and Amended Motion to Suppress Evidence [22] (together, the "Amended Motion"), be denied.[1]  Defendant seeks to suppress statements he made to law enforcement officers, and evidence seized from his vehicle, during an August 13, 2013, traffic stop.

On March 23, 2015, the Magistrate Judge conducted an evidentiary hearing on Defendant's motions.  Defendant claims the testimony presented by Officer

---

[1]      Defendant represents that the Amended Motion to Suppress Evidence "supplements and incorporates the original motion filed on December 23, 2014." (Am. Mot. at 1).

Donald Dejarnette ("Officer Dejarnette"), the only witness who testified at the evidentiary hearing, was not credible and does not provide a basis to find that the traffic stop was constitutional and, even if Dejarnette's testimony was credible, the stop was not constitutionally permitted.  Defendant challenges the statements as fruits of the unconstitutional detention and statements that were not made voluntarily after an advisement of Defendant's <u>Miranda</u> rights.

## I.      BACKGROUND

Defendant is charged with being felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count One), possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(B)(1)(C) (Count Two), and using and carrying a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count Three).

The charges arise from the stop of a vehicle that Defendant was driving on August 13, 2013.  The vehicle was stopped by Officer Dejarnette, a member of the DeKalb County Police Department North Central Task Force unit (the "Unit").  Officer Dejarnette, and his partner Officer Anderson, were patrolling in the area of Joy Lane and Peachcrest Road.  (Tr. [25] at 34).  The officers were patrolling in the area because "of the crime, burglaries, robberies, [and] home invasions" there.

(Id.).  Because crime spiked during that time of year, it was a problem area.  (Id.).
While on patrol, Lt. Baker of the Unit radioed and told Officer Dejarnette to be on
the lookout for a white Pontiac Grand Prix (the "Grand Prix").  Lt. Baker wanted to
know the car tag number and if they recognized anyone in the car.  (Id. at 8).  A
few moments later, Officer Dejarnette saw the Grand Prix approaching.  The car
began to slow down as it approached a stop sign at Peachcrest Road.  (Id. at 14).
Officer Dejarnette recognized Devon Fairly ("Fairly"), the passenger in the right
rear seat.  (Id. at 13).  He did not recognize the driver.  (Id.).

As the car approached the stop sign, it accelerated when the driver of the car
looked in the direction of Officer Dejarnette's patrol car.  (Id. at 14).  After failing
to stop at the stop sign, the Grand Prix entered the intersection and cut in front of a
Ford Ranger pickup truck, causing the driver to swerve and causing the truck's two
right tires to leave the road.[2]  (Id.).  At the time, the truck had control of the
intersection.  (Id.).

---

[2]     Officer Dejarnette did not note, in the narrative section of his report, that
Defendant failed to stop at the stop sign.  He did note in the offense section, as an
offense Defendant committed, that Defendant had not complied with a traffic
control device.  During an interview with federal law enforcement agents
sometime after the stop, Officer Dejarnette said he could not recall if the vehicle
Defendant had cut off was a bus, pickup truck, or SUV, and on one occasion he
could not recall if Defendant had come to a complete stop at the stop sign.
Sometime before a second meeting with an Assistant United States Attorney in
connection with this case, Officer Dejarnette ran into his partner, Officer

Based on the traffic violations he witnessed, Officer Dejarnette conducted a traffic stop of the Grand Prix.  (Id. at 19).  Officer Dejarnette testified that, when he approached the car after it stopped, he smelled marijuana.[3]  (Id. at 27). Defendant was driving the vehicle and was told that he was stopped for failure to stop at a stop sign.  (Id. at 19).  A fifteen-year-old boy, a thirteen-year-old boy, and a young child were also in the car.  (Id. at 21-22).  The thirteen-year-old was wearing a back brace.  Officer Dejarnette was aware that he had recently been shot and wounded.  (Id. at 21).

Defendant was asked to produce his driver's license.  He handed Officer Dejarnette a non-driver state identification card.  (Id. at 22).  A records check confirmed that Defendant did not have a valid Georgia driver's license.  (Id. at 23). At this point, Officers Dejarnette and Anderson told Defendant, and later the other occupants, to get out of the car.  (Id. at 24, 27).  Defendant was patted down and a

---

Anderson.  Officer Anderson and he discussed the August 13, 2013, events which "brought to light more of my memory of what happened that day."  (Id. at 17-18). Officer Anderson recalled that the Grand Prix pulled in front of a Ford Ranger. There is no evidence this was a prearranged meeting to discuss the case.  The Court notes that Officer Dejarnette met with Bureau of Alcohol, Tobacco, Firearms and Explosive agents and two different Assistant United States Attorneys on two occasions in connection with the case.

[3]     During his meeting with an Assistant United States Attorney working on the case, Officer Dejarnette could not recall if he smelled marijuana during the stop. At the evidentiary hearing he testified that he smelled marijuana when he approached the vehicle.

firearm magazine, loaded with ammunition, was discovered in his pocket.

(Id. at 24).  When the magazine was found, Defendant was handcuffed.  (Id.).

Because there were children in the car, Officer Dejarnette asked Defendant if the

gun used with the magazine was in the car.  (Id. at 24-25).  Defendant was not sure

whether his wife had removed it or left it in the vehicle.  (Id. at 25).  Defendant

was placed in the backseat of the police car.  (Id. at 26).

When Fairly got out of the car, the officers also discovered that Fairly had

been sitting on a small cigar wrapper that contained a green leafy substance.

(Id. at 28).  He was issued a citation for possession of a small amount of marijuana.

(Id. at 29).

The officers, having arrested Defendant, decided to impound the car because

no one in the vehicle was authorized to operate it and the registered owner was not

present.[4]  (Id. at 29).  Police department regulations require an inventory of a car

that is seized if no one is available to drive the stopped vehicle.  (Id. at 29-30).

Because of where the car was stopped, it created a safety hazard and had to be

towed.  (Id. at 29).

During the inventory of the car, the officers found in the glove box a

.40 caliber hand gun.  (Id. at 31).  Officer Dejarnette determined that the magazine

---

[4]     The car, apparently, was registered to Defendant's wife.  (Tr. at 47-48).

discovered in Defendant's pocket matched the gun that was discovered.  (Id.).
Officers also found approximately thirty (30) individually wrapped baggies of
suspected marijuana, a small baggie with a white rocky substance, some empty
baggies, and a digital scale.  (Id.).  The white rocky substance field-tested positive
for crystal methamphetamine.  (Id.).

At some point, Officer Dejarnette heard Defendant making noises in the
patrol car where he had been placed.  (Id. at 32-33).  He went to Defendant and
asked him, "what's wrong, is everything ok?"  (Id. at 33).  Defendant responded,
"everything is mine, it's all mine."  (Id.; see also Tr. at 54).

Later, and after the gun and marijuana were found in the glove box during
the inventory search, Officer Dejarnette commented to Defendant, "it's not good to
have the kids in there with all the stuff, especially after the incident that just
happened to the 13-year-old child."  (Id. at 36).  Defendant responded, "I have to
do something, my wife's sick . . .  and I have to do something to make money."
(Id.).

Defendant objects to the facts found by the Magistrate Judge on the grounds
that Officer Dejarnette's statements (i) about whether Defendant made a full stop
at the stop sign, (ii) the kind of vehicle Defendant cutoff when he entered the
intersection, and (iii) whether he smelled marijuana, are not credible and that the

Magistrate Judge could not rely on them or his testimony generally.  Defendant also objects to the findings in the R&R on the grounds that the stop of Defendant's vehicle was unconstitutional because it was not based on reasonable suspicion, the warrantless search of the Grand Prix was unconstitutional, and the statements Defendant made were not voluntary, in that Officer DeJarnette failed to advise Defendant of his rights under Miranda.

## II.     STANDARD OF REVIEW

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59; Williams v. Wainwright, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam).  A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).  This requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party."  Jeffrey S. v. State Bd. of Educ. of Ga., 896 F.2d 507, 512 (11th Cir. 1990) (internal citations omitted).  With respect to those findings and recommendations to which a party has not asserted objections, the Court must conduct a plain error review of the record.  United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983).

## III.   DISCUSSION

### A.   Credibility of Officer Dejarnette's Evidentiary Hearing Testimony

The Court has reviewed the findings of fact in the R&R and has read the transcript of Officer Dejarnette's testimony at the March 23, 2015, evidentiary hearing.  In doing so, the Court focused on claimed inconsistencies in the testimony that Defendant argues causes the testimony to be unreliable.  The Court, having read the testimony as a coherent whole, finds Officer Dejarnette's testimony credible.[5]

Defendant argues that certain specific "inconsistencies" in Officer Dejarnette's testimony causes the testimony, as a whole, to be unreliable. Defendant claims that Officer Dejarnette's testimony that Defendant failed to stop at the stop sign was inconsistent with his incident report that did not record, in the narrative section of the report, a failure to stop.  This omission was not overcome, Defendant contends, by Officer Dejarnette recording in the report that Defendant committed the offense of failing to abide by a traffic control device.  Officer Dejarnette testified at the evidentiary hearing that Defendant did not stop at the stop sign and, as a result, Defendant ran another vehicle off the road.  (Tr. at 14).

---

[5]   Having read the hearing transcript, the Court concludes that it is not necessary to conduct a further evidentiary hearing to resolve Defendant's credibility claim.

He also explained why he thought his failure to observe a traffic control device violation accurately recorded, in the report, Defendant's failure to comply with the stop sign.  (Id. at 60-62).  These explanations are logical and believable.  That a car was run off the road is a consequence of running through a stop sign and there was no evidence of another traffic control device at the intersection that was violated.

In support of his lack of credibility claim, Defendant next argues that Officer Dejarnette was not consistent with his description of the vehicle that he testified Defendant drove in front of and which was caused to run off the road.  (Id. at 18).  Defendant focuses on the vehicle type.  He does not dispute that a vehicle was run off the road.  Officer Dejarnette did describe the vehicle run off the road by different vehicle types including a bus, a truck, and an SUV.  (Id.).  He was consistent, though, that the vehicle was larger than a car and he was unequivocal at the hearing that the vehicle was a pickup truck.  (Id.).  What is critical to the stop was whether Defendant's car forced another vehicle off the road.  There is no dispute that it did.  The type of vehicle does not constitute an important detail.

Last, Defendant appears to argue that Officer Dejarnette's testimony was inappropriately influenced by the conversation with his partner, Officer Anderson.  Officer Dejarnette acknowledged that he ran into Officer Anderson shortly before he met with an Assistant United States Attorney involved in the case.  (Id. at 17).

9

It also is not disputed that Officers Dejarnette and Anderson discussed the August 13, 2013, traffic stop.  This discussion, Officer Dejarnette stated, helped him remember events surrounding the stop and helped him remember what happened before the stop.  (Id. at 17-18).  That Officer Dejarnette's discussion with his partner about some details of the stop was not planned but was helpful to him in remembering what occurred, supports that his testimony was credible, and not fabricated.  While it may have been preferable for Defendant if Officer Dejarnette had not spoken with his partner, he testified that by doing so, he was able to remember what occurred.  The facts are that Officer Dejarnette's account of the events that lead to the stop of Defendant's car were, when considered in the context of his testimony, believable, even if his recollection was not perfect.[6]

---

[6]     Defendant argues that it was not possible for Officer Dejarnette to have recognized any passenger in the car from his vantage point at the intersection, suggesting that the officer imagined seeing in the Grand Prix someone that he recognized.  This argument is speculative and does not account for the fact that Officer Dejarnette was alerted by Lt. Baker to see if he recognized anyone in the car.  Thus he was specifically looking for, and focused on, a specific vehicle—a white Grand Prix—and who was in it.  Had he been fabricating what he saw, he would more likely have said he saw Defendant in the Grand Prix.  Finally, to the extent that Officer Dejarnette could not remember during one of his several interviews with federal law enforcement personnel and lawyers whether he smelled marijuana as he approached the Grand Prix, does not made less credible his hearing testimony that he did.  It is not known how the question was asked when he said he did not remember smelling marijuana, and that an amount of marijuana was in a cigar wrapper on which one of the occupants had been sitting, supports

There is no evidence that he sought to fabricate or distort what occurred on August 13, 2013.

The Court notes finally that Defendant does not contest that there was reasonable suspicion to stop the car that Defendant was driving based on the driving conduct that occurred.  Having conducted its *de novo* review, the Court overrules Defendant's objection to the Magistrate Judge's reliance on Officer Dejarnette's testimony.

B.      Stop of the Grand Prix and Pat Down Search

First, Defendant claims the testimony of Officer Dejarnette was not credible and the Magistrate Judge's reliance on it in issuing his findings and recommendations does not support the constitutionality of the search of the Grand Prix.  The Court resolved this objection earlier in this Order and the objection is again overruled.  Defendant next objects to the Magistrate Judge's finding that the search of the Grand Prix was constitutional.

A law enforcement official may conduct an investigatory stop if there is reasonable suspicion that the person has engaged or is about to engage in criminal activity.  United States v. Arivizu, 534 U.S. 266, 273 (2002); Terry v. Ohio, 392 U.S. 1, 21 (1968); United States v. Hunter, 291 F.3d 1302, 1305-06

---

Officer Dejarnette's hearing testimony that marijuana was present and had been consumed.

(11th Cir. 2002) (citing Terry, 392 U.S. at 30) ("[A]n officer may conduct a brief, warrantless, investigatory stop of an individual when the officer has a reasonable, articulable suspicion that criminal activity is afoot, without violating the Fourth Amendment.").  This standard similarly governs investigative stops of vehicles. United States v. Sokolow, 490 U.S. 1, 7–8 (1989); United States v. Sharpe, 470 U.S. 675, 682 (1985); United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008) (citing Terry, 392 U.S. 1).  Reasonable suspicion requires less proof than a finding of probable cause.  United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990); United States v. Monzon-Gomez, 244 F. App'x 954, 959 (11th Cir. 2007) ("The Fourth Amendment plainly does not prohibit a law enforcement officer from pulling over a motorist for suspected speeding whenever the officer is acting solely on the basis of his visual observation.").  An officer need only have sufficient cause to believe that a traffic law has been violated, regardless of the officer's subjective motivations.  United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999).

Whether reasonable suspicion exists is determined by considering the totality of the circumstances and whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.  Arvizu, 534 U.S. at 273.  In determining whether there was reasonable suspicion to detain, "[g]reat deference is

given to the judgment of trained law enforcement officers 'on the scene.'"
Whether conduct is suspicious may take into account that the conduct observed
occurred in a high crime area.  United States v. Gordon, 231 F.3d 750, 755
(11th Cir. 2000).  That is, the "reputation of an area for criminal activity may be
considered when determining whether circumstances are 'sufficiently suspicious'
to warrant further investigation."  United States v. Hunter, 291 F.3d 1302, 1306
(11th Cir. 2002) (citing Gordon, 231 F.3d at 755-56); see also Illinois v. Wardlow,
528 U.S. 119, 124 (2000) ("We have previously noted the fact that the stop
occurred in a 'high crime area' among the relevant contextual considerations in a
Terry analysis.") (citing Adams v. Williams, 407 U.S. 143, 144 (1972)); see also
United States v. Chanthasouxat, 342 F.3d 1271, 1276 (11th Cir. 2003);
United States v. Griffin, 696 F.3d 1354, 1360 (11th Cir. 2012).  "[A]n individual's
proximity to illegal activity may also be considered."  Id.

"Once an officer has legitimately stopped an individual, the officer can frisk
the individual so long as 'a reasonably prudent man in the circumstances would be
warranted in the belief that his safety or that of others was in danger.'"  Id.
(quoting Terry, 392 U.S. at 27).  The Supreme Court and the Eleventh Circuit have
held that "the 'risk of harm' to officers is 'minimized' when police officers
'exercise unquestioned command of the situation.'"  United States v. Clark,

337 F.3d 1288, 1287 (11th Cir. 2003) (quoting <u>Michigan v. Summers</u>,

452 U.S. 692, 702-703 (1981)).

Here, Officer Dejarnette, present in an area known for crime, observed Defendant fail to stop at a stop sign and, pulling in front of another vehicle, forced two wheels of the other vehicle to leave the roadway.  (Tr. at 14).  These observations—the failure to observe a stop sign and the action forcing another vehicle to leave the roadway—each independently support that the officer had probable cause to stop the Grand Prix that Defendant was driving.  Defendant's driving conduct and his failure to fully stop at a stop sign, causing the Grand Prix to divert the path of another driver, each independently support that a traffic violation had occurred, entitling Officer Dejarnette to conduct the August 13, 2013, stop of Defendant's vehicle.

After it was stopped, Officer Dejarnette approached the vehicle, and when he did, he detected the smell of marijuana.  (Tr. at 27).  Defendant was driving the vehicle.  A fifteen-year-old boy, a thirteen-year-old boy, and a young child were also in the car.  The thirteen-year-old, whom Officer Dejarnette recognized, was wearing a back brace and Officer Dejarnette was aware that he recently had been shot and wounded.  (<u>Id.</u> at 21-22).

14

Defendant was asked to produce his driver's license.  He handed Officer Dejarnette a non-driver state identification card.  At this point, Officer Dejarnette and his partner told Defendant to get out of the car.  When Defendant was patted down, a loaded firearm magazine in Defendant's pocket was discovered. (Id. at 22-24).

The totality of the facts here support that Officer Dejarnette had, at least, a reasonable belief that Defendant had committed a traffic offense, was driving without a license, and that marijuana had been used in the car.  There was more than ample information available to Officer Dejarnette to conduct the traffic stop in this high crime area where he was patrolling, and there was a sufficient basis for Officer Dejarnette to conclude that the safety of the officers, and others, was in question, thus allowing a pat down search of Defendant.  See Terry, 392 U.S. at 30; Simmons, 172 F.3d at 778; Hunter, 291 F.3d at 1305-06.  The firearm magazine was identified and seized pursuant to a constitutionally permissible pat-down search.  Defendant's objection to the seizure of the firearm magazine is overruled.

15

C.   Inventory Search[7]

An inventory search conducted according to standardized criteria constitutes

one of the well-defined exceptions to the probable cause and warrant requirements

of the Fourth Amendment.  Colorado v. Bertine, 479 U.S. 367, 371 (1987);

South Dakota v. Opperman, 428 U.S. 364 (1976).  There are three main policy

---

[7]    The parties focused on whether an inventory search was properly conducted.
Even though this is where the parties focused, the Court also evaluated the search
under the automobile exception.  In Arizona v. Gant, 556 U.S. 332 (2009), the
Supreme Court held that police may search the passenger compartment of a vehicle
incident to a recent occupant's arrest only if it is reasonable to believe that the
arrestee might access the vehicle at the time of the search or that the vehicle
contains evidence of the offense of arrest.
    The "automobile exception" allows law enforcement officers to "conduct a
warrantless search of a vehicle if: (1) the vehicle is readily mobile (i.e.,
operational); and (2) officers have probable cause to believe the vehicle contains
contraband or evidence of a crime."  United States v. Adigun, 567 F. App'x 708,
711 (11th Cir. 2014) (citing Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)).
The Fourth Amendment does not require exigent circumstances beyond the fact
that a vehicle is functional and readily mobile.  See, e.g., United States v. Watts,
329 F.3d 1282, 1286 (11th Cir. 2003).  "[A]lthough ready mobility was perhaps the
original justification for the vehicle exception . . . [it] is not the only basis for the
exception. . . . 'Besides the element of mobility, less rigorous warrant requirements
govern because the expectation of privacy with respect to one's automobile is
significantly less than that relating to one's home or office.'"  California v. Carney,
471 U.S. 386, 391 (1985) (quoting South Dakota v. Opperman, 428 U.S. 364, 367
(1976)).  As Officer Dejarnette approached the Grand Prix, he detected the odor of
marijuana smoke.  Once at the car, he saw two young men and child in the rear
seat.  One of the young men had recently been shot.  Defendant failed to produce a
driver's license.  When one of the young men got out of the car, suspected
marijuana was seen in a cigar wrapper.  These facts would lead a reasonably
prudent police officer to conclude that the car contained evidence of a crime and a
search under the automobile exception was justified.

reasons for conducting inventory searches: (1) to protect the owner's property while it is in custody; (2) to insure against claims of lost, stolen, or vandalized property; and (3) to protect the police from danger.  See Florida v. Wells, 495 U.S. 1, 4 (1990).  To uphold a search under the inventory search doctrine, "the police must first have the authority to impound the vehicle and must then follow the procedures outlined in the [standardized impound] policy." United States v. Williams, 936 F.2d 1243, 1248 (11th Cir. 1991).

Law enforcement may lawfully impound a vehicle when they have arrested its occupant—even if the vehicle is not impeding traffic or otherwise presenting a hazard—"so long as the decision to impound is made on the basis of standard criteria and on the basis of something other than suspicion of evidence of criminal activity."  Sammons v. Taylor, 967 F.2d 1533, 1543 (11th Cir. 1992) (internal quotations omitted).  The decision to impound an arrestee's vehicle must be made "in good faith, based upon standard criteria, and not solely based upon suspicion of criminal activity."  Id. (internal citation omitted).  An inventory search may include a search of closed containers, provided the search is conducted pursuant to standardized criteria.  Id.  The government has the burden to show that the requirements of the inventory search exception have been met.  Id.

The requirement of a standardized impound policy "ensures that an inventory search is not a ruse for a general search to discover incriminating evidence." Wells, 495 U.S. at 3. "An inventory search is not a surrogate for investigation, and the scope of an inventory search may not exceed that necessary to accomplish the ends of the inventory." United States v. Khoury, 901 F.2d 948, 958 (11th Cir. 1990) (citing United States v. Laing, 708 F.2d 1568, 1570 (11th Cir. 1983)).

"[T]he mere expectation of uncovering evidence will not vitiate an otherwise valid inventory search." United States v. Roberson, 897 F.2d 1092, 1096 (11th Cir. 1990) (quoting United States v. Bosby, 675 F.2d 1174, 1179 (11th Cir. 1982)). Police do not violate an arrestee's Fourth Amendment rights merely by impounding a vehicle rather than permitting him to make alternative arrangements for the vehicle's disposition. Bertine, 479 U.S. at 373-74.

The testimony at the evidentiary hearing was that Defendant did not have a driver's license and there was no one else in the car that was licensed to drive. (Tr. at 29-30). As a result, Officer Dejarnette concluded that DeKalb Police Department policy required the car to be impounded because there was no person authorized to drive it and the car was in the roadway. (Id.). Because the car was to be impounded, Officer Dejarnette conducted an inventory search of the vehicle as

required by DeKalb County Police Department Policy.  (Id.).  During the inventory search process, officers found, in the glove box, a.40 caliber hand gun that matched the magazine discovered in Defendant's pocket, approximately thirty (30) individually wrapped baggies of suspected marijuana, a digital scale, several empty baggies, and a small baggie with a white rocky substance that later tested positive for methamphetamine.  (Id. at 31).  These items were seized incident to the search.

On *de novo* review, the Court finds that the inventory search and the seizure of the firearm, suspected marijuana, and methamphetamine was conducted pursuant to a valid inventory search.  See, e.g., Bertine, 479 U.S. at 371; Williams, 936 F.2d at 1248.  Defendant's objection to the search and seizure of these items is overruled.[8]

D.    Statements by Defendant

It is well-established that "mere police questioning does not constitute a seizure" implicating the Fourth Amendment.  Griffin, 696 F.3d at 1360 (citing Muehler v. Mena, 544 U.S. 93, 101 (2005)); see also Arizona v. Johnson, 555 U.S. 323, 333 (2009) (officer's inquiry into matters unrelated to the justification for the stop does not convert stop into something other than a lawful seizure if questioning does not measurably extend the length of the stop).  The

---

[8]    Even if the inventory search exception did not apply, the Court would find the search was within the automobile exception to the warrant requirement.

Eleventh Circuit has squarely held that an officer's questions during a stop, even if unrelated to the matter investigated, "do not create a Fourth Amendment problem unless they 'measurably extend the duration of the stop.'"  Id. at 1362 (quoting Johnson, 555 U.S. at 333).  "This is because such questions, absent a prolonged detention, do not constitute a 'discrete Fourth Amendment event.'"  Id. (quoting Mena, 544 U.S. at 101).

A suspect in custody must be advised of his right to remain silent and his right to the assistance of counsel prior to any interrogation.  Miranda, 384 U.S. at 444 ("Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."); see also Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989). Miranda's safeguards apply to the "functional equivalent" of interrogations as well as official, custodial interrogations.  Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

An officer engages in the "functional equivalent" of interrogation when he engages in "words or actions . . . (other than those normally attending to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Id.; see also United States

20

v. Ubaldo-Viezca, 398 F. App'x 573, 579-80 (11th Cir. 2010) (quoting Innis, 446

U.S. at 300-02).  The question is whether the words or actions of the authorities

constitute coercive pressure "above and beyond that inherent in custody itself."

Innis, 446 U.S. at 300.  The Innis inquiry "focuses primarily upon the perceptions

of the suspect."  Id. at 301; see also United States v. McKenzie, 132 F. App'x 788,

790 (11th Cir. 2005) (police officer's conversation with defendant advising him

that marijuana and cocaine were found in his room was not functional equivalent

of interrogation when defendant responds); United States v. Hurst, 228 F.3d 751,

758-59 (6th Cir. 2000) (Miranda warnings not required when law enforcement told

defendant "we've got good information on you."); United States v. Payne,

954 F.2d 199, 203 (4th Cir. 1992) (statement to suspect that gun was found at his

house, to which suspect responded, was not interrogation).

The Supreme Count and the Eleventh Circuit have consistently held that a

narrow exception to Miranda exists in situations where there is a threat to public

safety.  See United States v. Newsome, 475 F.3d 1221, 1224-25 (11th Cir. 2007)

(citing New York v. Quarles, 467 U.S. 649, 657-58 (1984)).  "The public safety

exception allows officers to question a suspect without first Mirandizing him when

necessary to protect themselves or the general public."  Id. at 1224.

Here, Defendant was patted down and a loaded firearm magazine was discovered in his pocket.  (Tr. at 24).  Because there were children in the car, Officer Dejarnette asked Defendant if the gun used with the magazine was in the car.  (Id. at 24-25).  Defendant responded that he was not sure whether his wife had removed it or left it in the vehicle.  (Id. at 25).  Officer Dejarnette's concern for the safety of the officers and others, including the children in the car—one of whom had recently been shot and wounded—supports his limited question regarding the location of the firearm used with the loaded magazine found on Defendant's person.  See Newsome, 475 F.3d at 1224-25 (officer permissibly asked defendant, before Miranda warning, whether there was anything or anyone in the room he should know about, to which defendant disclosed location of a gun).  Upon *de novo* review, the Court determines that Defendant's statement that he was not sure whether his wife had removed the firearm from the vehicle, is not required to be suppressed, and his objection is overruled.

Defendant was then placed in the backseat of the police car.  While the on-site investigation was being conducted and Defendant was sitting in the patrol car, Officer Dejarnette heard Defendant making noise in the car.  (Tr. at 32-33). The officer went to the car and asked Defendant: "What's wrong, is everything ok?"  (Id. at 33).  In response to this general question about his well being,

Defendant responded, "everything is mine, it's all mine." (Id.). Sometime later and after the firearm was found in the glove box, Officer Dejarnette said to Defendant, "it's not good to have the kids in there with all the stuff, especially after the incident that just happened to the 13-year-old child." (Id. at 36). In response to this statement, Defendant stated: "I have to do something, my wife's sick . . . and I have to do something to make money." (Id.).

Once in custody, a defendant is required to be given his Miranda warnings before he is interrogated. There must, however, first be an interrogation or the functional equivalent of one. Defendant's statement that "everything is mine" was not given during an interrogation. Officer Dejarnette was responding to noises Defendant was making in the patrol car. He simply asked about Defendant's condition and whether everything was all right. He was not questioned within an investigation and he did not make an incriminating response during the course of an interrogation. Upon de novo review, the Court determines that Defendant's statement that "everything is mine, it's all mine" was not made during an interrogation, or the functional equivalent of one, and his objection is overruled.

Defendant next challenges the finding and recommendation of the Magistrate Judge that Defendant's statement that his wife was sick and he needed to make money is not required to be suppressed. The question here is whether

Officer Dejarnette's statement that he should not have had the kids in the car with the "stuff" found in the car was a police practice was sufficiently coercive that it was likely to evoke an incriminating response.  See United States v. Stubbs, 944 F.2d 828, 832 (11th Cir. 1991).  Focusing on the perceptions of Defendant, the Court determines that the statement made to him was not coercive and was not reasonably likely to evoke the response that Defendant gave.  The comment that it was not good to have the things discovered in the car in which there were children was not reasonably calculated to invoke any response—it was simply a comment made to Defendant.  See McKenzie, 132 F. App'x at 790; Hurst, 228 F.3d at 759. That Defendant would respond with the statement that he did, was unexpected.  It certainly was not a response to a question or a statement likely to evoke an incriminating response.  Upon *de novo* review, the Court concludes that Defendant's statement, "I have to do something, my wife is sick . . . and I have to do something to make money," is not required to be suppressed, and his objection is overruled.

## IV.   CONCLUSION

Having conducted its *de novo* review of the findings and recommendations in the R&R to which Defendant objects, the Court finds that Defendant's

objections are required to be overruled.  The Court also finds no plain error in the findings and recommendations to which Defendant did not object.  Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Objections [39] are **OVERRULED.**

**IT IS FURTHER ORDERED** that Magistrate Judge Justin S. Anand's Report and Recommendation [35] is **ADOPTED.**

**IT IS FURTHER ORDERED** that Defendant's Motion to Suppress Statements [12], Motion to Suppress Evidence [13] and Amended Motion to Suppress Evidence [22], are **DENIED.**

**SO ORDERED** this 18th day of August, 2015.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE